James GOODWIN, David K., Elizabeth F., Marlene Lucas, Tammy Hoernlen, Eula Vassar, Sally Ann T., Barry Auerbach, Tracey Jones, Wayne Bailey, Veronica Gray, W.M., Troy C., Peter M., Lloyd Harris, and Roberta Milla, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Peter SHAPIRO, individually and as County Executive of the County of Essex, State of New Jersey; Michael P. Duffy, individually and as Director, Essex County Hospital Center; David Paschal, individually and as Director, Essex County Department of Health and Rehabilitation; Arthur Avella, M.D., individually and as Medical Director, Essex County Hospital Center; Ralph Spiro, individually and as Director, Department of Social Services, Essex County Hospital Center, Defendants.

Civ. A. No. 80-2828.

United States District Court,
D. New Jersey.

Aug. 2, 1982.

Joseph H. Rodriguez, Public Advocate by Paula S. Chaffin, Asst. Deputy Public Advocate, Dept. of the Public Advocate, Div. of Mental Health Advocacy, Essex County Regional Office, Newark, N.J., for plaintiffs.

David H. Ben-Asher, Essex County Counsel by Susan J. Barone, Asst. Essex County Counsel, Newark, N.J., for defendants.

## OPINION

STERN, District Judge.

This action was brought pursuant to 42 U.S.C. § 1983 by sixteen past and present patients at the Essex County Hospital Center in Cedar Grove, New Jersey, a psychiatric hospital run by Essex County, on behalf of themselves and all others similarly situated. The named defendants were Peter Shapiro, the Essex County Executive; Michael P. Duffy, Director of the Essex County Hospital Center; David Paschal, Acting Director of the Essex County Department of Health and Rehabilitation; Theresa Bielawski, M.D., Acting Medical Director of the Essex County Hospital Center; and Michael Woodman, Director of the Department of Social Services at Essex County Hospital Center.[1]

Plaintiffs sought declaratory relief and an injunction restraining defendants from maintaining conditions and pursuing policies which they alleged deprived them of their right to meaningful treatment; subjected them to inhumane and unsafe environmental factors, such as physical abuse and overcrowded ward conditions; deprived them of effective medical care; confined them in unduly restrictive ward settings; deprived them of their fundamental personal and civil rights; and denied them access to their own funds. Plaintiffs contended that these alleged conditions and policies deprived them of their rights under the

---

1. When Arthur Avella, M.D. replaced defendant Bielawski as Medical Director of the hospital and when Ralph Spiro replaced Michael Woodman as Director of Social Services, they were substituted as parties to this lawsuit pursuant to a Stipulation of Substitution approved by the Court's Order of October 28, 1980.

First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the Constitution as well as various laws and statutes of the United States and the State of New Jersey.

On February 25, 1981, upon motion of plaintiffs and after hearing oral argument, the Court entered an Order certifying this action as a class action under Fed.R.Civ.P. 23(b)(2), with the class consisting of all past, present, and future patients at the Essex County Hospital Center.

On July 20, 1981, the parties entered into a Stipulation of Settlement resolving all of the matters raised by the lawsuit. After a hearing on that same date, the Court entered an Order approving the settlement and dismissing the complaint with prejudice. As part of the settlement, the parties agreed that its terms should be monitored by a Court-appointed Master and the Court appointed John J. Barry, P.C., Gateway One, Newark, New Jersey, an attorney of the Bar of the State of New Jersey, to serve in that capacity.[2]

The parties have requested that the Court issue this opinion so that the terms of the stipulation may be published. The Court is pleased to comply with this request, especially in view of the far-reaching and comprehensive provisions of the agreement. Indeed, the Court wishes to commend counsel for both parties for reaching an agreement that is both fair and equitable and which will undoubtedly be of enormous benefit to the patients at the Essex County Hospital Center.

The text of the Stipulation of Settlement is therefore set forth as follows:

## STIPULATION OF SETTLEMENT

WHEREAS, litigation is pending between the Parties relating to the constitutional and statutory rights of the Plaintiff class; and

WHEREAS, subsequent to the institution of this litigation the Parties to this Agreement have had an opportunity to explore fully the facts and circumstances which relate to the matter; and

WHEREAS, upon consideration of all relevant facts and circumstances the parties desire to reach an amicable resolution of this litigation; and

WHEREAS, negotiations between the parties have now resulted in their reaching such an agreement;

NOW, THEREFORE, the Parties stipulate as follows herein in the Stipulation Agreement attached hereto.

| ITEM | PAGE |
|------|------|
| Definitions | 828 |
| I. Safety & Maintenance | 828 |
| Habitability | 829 |
| Bathrooms and Lavatories | 829 |
| II. Physical & Psychological Environment | 830 |
| Resident Unit | 830 |
| Day Room | 830 |
| Dining Facilities | 830 |
| III. Treatment | 830 |
| Admissions | 830 |
| Acute Psychiatric Care and Intervention | 832 |
| Personal Care Unit | 833 |
| Socialization Service Unit | 833 |
| Community Oriented Unit | 834 |
| Medical Services | 834 |
| Outreach Unit | 835 |
| Adolescent Unit | 835 |
| General Services | 836 |
| Activities Therapy | 836 |
| Individualized Treatment Plans | 836 |
| IV. Token Economy and Behavior Modification Program | 840 |
| V. Staffing | 840 |
| Staff to Patient Ratio Per Unit | 840 |
| Staffing Ratios Per Work Shift | 841 |
| Qualified Staff to Provide Adequate Services | 842 |
| Staff (In-Service Training) | 843 |
| VI. Quality Control and Program Evaluation | 843 |
| VII. Nutritional Standards and Diets | 843 |
| VIII. Pharmaceutical Services | 844 |
| IX. Medical Records | 844 |
| X. Patients Discharged Pending Placement | 844 |
| XI. Miscellaneous Provisions | 844 |
| Psychotropic Medication for Involuntarily Committed Patients | 845 |
| Patients Funds | 845 |
| Allegations of Physical Abuse | 846 |
| Levels of Supervision | 847 |
| XII. Monitoring Agreement | 849 |

---

**2.** The Court wishes to express its appreciation to Mr. Barry for assuming the role of master in this case.

It is on this 2nd day of July, 1981 stipulated and agreed between and among the parties signatory hereto that:

1. This agreement is entered into in light of the parties' concern that requirements of the federal and state constitutions and of federal and state statutes regarding patients' treatment and patients' rights are satisfied, and in order to provide to patients other guarantees which the parties regard as important as a matter of public policy. No determination or agreement is intended or reached herein regarding the validity or invalidity of the allegations of the complaint in this action.

2. The parties hereto agree to have an objective observer monitor this agreement pursuant to the Monitoring Agreement at Section XII herein.

3. The Parties shall cooperate with the Monitor in his/her efforts to facilitate compliance with this agreement. For this purpose, the County Administration and the Public Advocate shall designate staff persons responsible for coordinating implementation of this agreement 90 days from its signing.

4. The rights, standards and services set forth herein shall be implemented within the context of the public policy declared in *N.J.S.A.* 30:4–23, et seq., as well as N.J.A.C. 10:37–1 et seq. as promulgated by the New Jersey Department of Human Services for the New Jersey Division of Mental Health and Hospitals and incorporating the four service concepts, Advocacy, Normalization, Level of Functioning and Unified Services, as the basic framework for the delivery of services.

## DEFINITIONS

"Mental Health Professional": shall be Psychiatrist; or a Medical Doctor (M.D.); or a psychologist who is a member of the therapeutic team; or a Registered Nurse (RN) who is a member of the therapeutic team; or a social worker with a MSW degree.

"Psychologist": shall have a doctoral degree from an accredited program, or a master's degree from an accredited program with 2 years experience under a licensed clinical psychologist.

"Activities Therapist": in such categories as vocational rehabilitation, occupational and recreational, music or art therapy, shall be a specialist graduated from an accredited program.

"Unit Chief": shall be a Board eligible or Board certified psychiatrist who is in charge of a designated area, treatment team, ward or multiple wards or a medical doctor when Medical services are the basic services provided.

## I. SAFETY & MAINTENANCE OF PHYSICAL PLANT

A. The County shall maintain a program of adequate housekeeping and maintenance of buildings and equipment which shall insure a continuous state of good repair and operation in accordance with the needs of the health and safety of the patients. The Hospital center shall maintain the standards as promulgated by the Joint Commission on the Accreditation of Hospitals (hereinafter J.C.A.H.)

1. By June 1982, the County shall correct deficiencies in maintenance, including elimination of backlogs in maintenance procedures.

2. By January 1982, the County shall comply with the provisions of the Life Safety Code of the National Fire Protection Association, and with the functional safety and sanitation requirements of the Joint Commission on the Accreditation of Hospitals, as well as all applicable state and local regulations, except that the Wright Pavilion shall comply by December 1983, and the smoke towers on the Hill Buildings shall comply by December 1981.

3. Special attention shall be paid to the needs of physically handicapped patients.

4. There shall be monthly unannounced fire drills for each shift, except that fire drills for the 11:00 p. m. to 7:00 a. m. shift shall be held quarterly.

Staff and residents shall be trained in emergency procedures, particularly for use in case of fire.

5. Adequate heating, air conditioning and/or ventilation systems and equipment shall be afforded to maintain temperatures and air changes which are required for the comfort of patients at all times and for the removal of undesired heat, steam and offensive odors.

6. Thermostatically controlled hot water shall be provided in adequate quantities and maintained at the required temperature for patient or resident use and for mechanical dishwashing and laundry use (180° F at the equipment). The facility water supply system shall not be connected with any other piping systems or with fixtures which could allow contamination of the water supply.

7. Adequate refuse facilities shall be provided so that solid waste, rubbish and other refuse shall be collected and disposed of in a manner which will prohibit transmission of disease and not create a nuisance or fire hazard or provide a breeding place for rodents and insects.

8. Engineering and maintenance personnel shall be adequate in number and in qualification to ensure that the physical facilities meet all fire and safety standards established by the State and that the Hospital meets such provisions of the Life Safety Code of the National Fire Protection Association as are applicable to the facilities or as are required for accreditation by J.C.A.H.

9. A committee shall be established to maintain surveillance of inadvertent Hospital infection potentials and other hazards to patients and to promote an appropriate preventive and corrective program designed to minimize these hazards.

## B. HABITABILITY

The County shall provide patients with living facilities which afford privacy, dignity, comfort and sanitation, consistent with the rights enumerated in *N.J.S.A.* 30:24.1 and 30:24.2.

Such facilities shall include, but not be limited to:

*Bathrooms and Lavatories*

1. Accessible, properly ventilated, private and easily usable toilets and bathing facilities, including specialized equipment for the physically handicapped. There shall be a minimum of one toilet for each eight patients and one lavatory for each six patients and a lavatory with each toilet facility to be attained by January 1982. Toilets are defined to include commodes and/or urinals depending on the sex of the patient using the facility.

2. Accessible and easily usable sinks and drinking facilities.

3. Adequate toilet paper, soap and towels available in all bathrooms, at all times. The Hospital administrator shall insist on staff vigilance to replace supplies as often as required.

4. There shall be one tub or shower for each fifteen patients. If a common bathing area is provided, each shower area shall be divided by curtains to ensure privacy.

5. Showers and tubs shall be conveniently located so that if staff assistance is needed by a patient the location of the shower does not make assistance difficult. Shower controls shall be within easy reach of all patients. Showers and tubs shall be equipped with adequate safety accessories.

6. The Hospital shall provide adequate facilities and equipment for handling clean and soiled linen and bedding. There shall be frequent changes of linen and bedding, at least every seven (7) days.

7. Every building shall be kept clean, odorless and insect-free at all times, and sufficient equipment such as brooms, mops, disinfectants, etc., shall be provided to housekeeping staff for this purpose. In particular, lavatory areas are to be cleaned as often as necessary every day.

The County shall comply with Section A and B above, one year from the signing of this Agreement unless stated otherwise.

## II. PHYSICAL & PSYCHOLOGICAL ENVIRONMENT

### 1. *Resident Unit*:

The number of patients in a multi-patient room shall not exceed eight persons (fewer if possible) except for the Medical Services Building. There shall be allocated a minimum of seventy-two (72) square feet of floor space per patient in multi-patient rooms. Single rooms shall have a minimum of ninety (90) square feet of floor space. The space requirement shall be achieved by December 1981, except for the Wright Pavilion, where these standards shall be achieved by December 1982.

Screens or curtains shall be provided to ensure privacy within the resident unit. Each patient shall be furnished with a comfortable bed with adequate change of linen, a bedside table and a lockable closet or locker for personal belongings. Fifty percent of the required screens, curtains, tables and lockable units shall be in place by June 1982 and all of them shall be in place by December 1983.

To the maximum extent possible, patients shall be housed in single or two-bed rooms.

### 2. *Day Room*:

The minimum day room area shall be forty (40) square feet per patient. These areas and the Activity Therapy Building shall provide for a full range of patient activity from two-person conversation to group activities. These rooms shall be attractive and adequately furnished with reading lamps, tables, chairs, television and other recreational facilities. They shall be conveniently located to patients' bedrooms and shall have outside windows. There shall be at least one day room area for each bedroom floor in a multi-story building except for the Hill Buildings where the day rooms are on a different floor. Areas used for corridor traffic shall not be considered as day room areas.

Furnishings in common areas such as day rooms shall be as homelike as possible and shall be relatively expendable or able to withstand the more destructive patient. Patients shall be encouraged to personalize their sleeping areas by displaying personal possessions.

### 3. *Dining Facilities*:

a) The minimum dining room area shall be ten (10) square feet per patient. The dining room shall be separate from the kitchen and shall be furnished with comfortable chairs and tables with hard, washable surfaces. These standards shall be achieved by December 1981.

b) Patients shall not be denied access to dining rooms for regular meals except for valid medical reasons which shall be documented in the event of each denial of access.

## III. TREATMENT

A. As long as the County maintains the Hospital Center, it shall provide direct patient care services as delineated below. Under no circumstances shall the Hospital be operated without an Admissions Unit and an Acute Psychiatric Care and Intervention Unit. If the Hospital should decide to abolish any unit, the Hospital shall continue to provide services as set forth herein to any patient for whom those services would be appropriate. The hospital shall immediately begin the process of implementing the specific services for the units they maintain and shall complete the process no later than December 1982 unless otherwise specified herein.

### 1. *Admissions*

a) The Admissions Unit must recognize and deal with the stresses that brought the person to seek treatment and the stresses he/she feels in entering treatment. Since the admission process will have crucial effects that may hinder or facilitate a patient's stay at Essex County Hospital Center, the admission process must be as humane and non-mechanistic as possible so that the patient feels comfortable and reas-

sured. Admissions procedures shall be designed and conducted to inspire a feeling of trust and friendship in the patient and his family.

b) Whenever possible, attempts shall be made to refer persons to community facilities rather than admitting the person to one of the Hospital's service units.

c) The major responsibilities of this service include:

1. orientation of the patient and family in a humane manner to the functions, activities, rules, operating policies, services and treatment programs provided in order to facilitate the patient's stay at Essex County Hospital Center;

2. evaluation within a 3 to 5 day period the appropriateness of admissions or of discharge. During that 3 to 5 day period, a reasonable number of diagnostic and treatment programs, including a comprehensive physical examination, must be employed in order to deliver prompt, effective and continuous services to all admissions. There shall be continuous followup and monitoring of treatment found to be necessary by the results of diagnostic procedures and laboratory tests. Medical care shall be made available to the patients throughout his/her Hospital stay;

3. if the patient is appropriate for admission, administration by the staff of the admissions unit of a preliminary level of functioning assessment to determine some of the needs of the individual patient so that treatment teams both within the Hospital and authorized community agencies have useful information. The staff of the Admissions Unit shall then administer a level of functioning assessment to determine all the needs of the individual and shall work with the patients in the development of a preliminary individual treatment plan.

d) The length of stay of a patient in the Admissions Unit shall not exceed eight (8) working days without approval of the Clinical Director or his/her designee. A written progress note that documents the reason or reasons why any resident must reside in the Admissions Unit for longer than eight (8) working days must be submitted to the Clinical Director or his/her designee for his approval prior to extending the stay beyond eight (8) working days. The designee may not be the patient's treating physician.

e) The Hospital shall encourage, facilitate and make good faith efforts toward providing citizen and community advocates (including volunteers and others) for individual patients at Essex County Hospital Center for the duration of such patient's stay.

f) Essex County Hospital Center shall implement diagnostic screening techniques based on a complete range of diagnostic procedures currently available.

g) The County shall develop a new Hospital admissions policy consistent with the following guidelines in order to survey the current Hospital population and to identify groups traditionally referred and admitted; the following categories of individuals should be seriously considered for exclusion within the new policy: a) persons with major medical problems, with minor mental symptoms; b) persons with chronic brain syndrome; c) persons primarily needing adequate living accommodations, economic or other social support services to relieve stress; and d) persons with primary problems such as: alcohol and/or drug abuse without major mental illness, patients who are in acute toxic states due to alcohol abuse and acute toxic states due to drug abuse; e) nursing home care; f) mental retarded.

1. Adolescents shall be screened in accordance with the above stated policy. Screening shall be done in the Admissions Office; the adolescent patient shall then be sent to the Adolescent Unit and shall not be held on the Admissions Unit.

2. The Hospital shall exercise professional judgment in the acceptance of 15 day magistrates' commitments, in compliance with *N.J.S.A.* 30:4–26.3.

3. In compliance with *N.J.S.A.* 30:4–37, or 30:4–38, and 30:4–39, the Hospital shall refuse regular Class B & C commitments that are inappropriate

h) Implementation: The purpose of the Admissions Unit/Service shall be to properly admit, evaluate and refer persons for placement in an appropriate service component of the mental health delivery system, whether that is to be within the Hospital or the community. The rule of the Admissions Unit shall not be to provide extended treatment but to allow for therapeutic intervention and short-term stabilization up to a maximum of eight (8) working days of intensive evaluation and care. In all cases, attempts shall be made to refer persons to appropriate and available community alternatives rather than admitting the person to the Hospital. The Hospital and County administration shall accept responsibility for the implementation of the admission policy by admission office staff and monitor mental health agency staff responsiveness. The major responsibilities of the Admissions Unit shall be:

1. to evaluate the appropriateness for admission, further treatment, referral or discharge. To this end, a wide range of diagnostic and assessment modalities and techniques should be available to deliver prompt and effective evaluative service;

2. to orient the person and the family in a humane manner to the functions, activities, rules, operating policies, rights, services, and treatment programs provided in order to facilitate the person's admission into the Hospital setting if admission is appropriate;

3. if appropriate for admission, to prepare the person for movement to the service area or program that best meets his/her needs, at the time, within the least restrictive environment, and to provide a comprehensive admissions packet and evaluation of the person which may also include data from the referring community service facility for use by treatment teams within the Hospital;

4. to provide short-term emergency crisis intervention, stabilization or short-term treatment to individuals as defined in Section III, 2 herein. Staff training sessions shall be held internally. The written policy shall be widely disseminated, and community education meetings should be held with County and Hospital administrative staff, the County Mental Health Administrator and Board, community mental health agencies, and community gatekeeper agencies (police, court personnel general hospital emergency room staff, etc.) to inform referral agencies about the new policy and to urge the use of less restrictive community alternatives.

2. *Acute Psychiatric Care and Intervention*

a) Acute psychiatric care and intervention resulting from crisis and conflict is best treated in the unit which is most familiar to the patient. When a patient is perceived as a danger to him/herself or others, he/she shall be treated by a one to one intervention or other modality. In the event that treatment is not effective, the patient shall be transferred to the male/female hyperactive ward unit which shall handle the crisis.

b) This acute psychiatric care and intervention shall be available to all patients.

c) Referral to the hyperactive wards for acute psychiatric care must be made by the sending unit chief or the supervising physician in charge of the unit.

d) The length of stay for patients transferred to the hyperactive wards shall be temporary and short term based upon the evaluation by the therapeutic team. If any patient being treated for acute psychiatric care and intervention remains on these wards for longer than ten (10) working days, a written progress report specifying reasons for continued stay on the ward must be submitted to the Clinical Director for approval. A similar report shall be prepared for every five (5) days of continued stay. No person shall remain on the ward for more than thirty (30) calendar

days except upon a showing of exceptional circumstances which shall be fully documented in the record with specificity.

e) The major responsibilities of this service are:

1. Internal Management: psychiatric and psychological interventions designed to stabilize the individual toward resuming management of emotions, thoughts and behavior;

2. development of appropriate intervention skills;

3. physical health maintenance;

4. life support skills;

5. vocational-educational-economic skills;

6. return of patients to functionally-oriented units as quickly as possible.

### 3. *Personal Care Unit*

a) Residents placed in the Personal Care Unit need skills for daily living activities. The basic criteria for placement in this service area are:

1. physical or mental handicap that hinders an individual from functioning independently;

2. inability to care for basic personal needs (such as dressing, toileting, etc.), or

3. mental confusion that prevents an individual from functioning appropriately as well as independently.

b) The major responsibilities of this service include:

1. Life Support: refamiliarization and reacquisition of skills necessary for life outside the Hospital especially for placement in a long-term care facility;

2. Physical Health: health maintenance and restoration;

3. Internal Management: acquisition of and training in effective habits of coping with the patient's own thoughts and emotions;

4. Interpersonal Skills: acquisition and training in acceptance of everyday relationships with people;

5. Vocational - Economic - Educational: basic economic information, facts and skills required to live outside the Essex County Hospital Center.

c) Specific programs shall include such activities as reality orientation, bowel and bladder training, feeding skills and good grooming.

### 4. *Socialization Service Unit*

a) Residents placed in the Socialization Unit need skills in socialization and/or acquiring socially acceptable behavior. The basic criteria for placement in this service are:

1. patient has difficulty establishing, maintaining, or developing appropriate interpersonal relationships; or

2. individual may exhibit socially unacceptable habits such as being verbally abusive, physically assaultive, destructive to property, self-destructive or has other behavior problems which limit social acceptability and make return to the community more difficult.

b) The major responsibilities of this service include:

1. Development of appropriate interpersonal skills;

2. internal self-management;

3. development and maintenance of life support skills;

4. vocational-educational-economic self-maintenance skills; and

5. physical health care.

c) Specific programs shall include such activities as direct reinforcement, vocational rehabilitation, community re-entry programs such as good grooming, recreational therapy and occupational therapy, and socialization programs such as cooking and remotivation.

d) The Socialization Unit shall prepare patients for movement either directly to the community or the Community Oriented Unit for preparation for discharge. Living arrangements, daily activities, and use of supportive services shall be as close to the normal patterns of community life as possi-

ble. Programs shall be organized to promote dignity, mobility and independence. Special attention shall be paid to the vocational, educational, economic and self-maintenance skills a patient will need to survive in community life.

### 5. Community Oriented Unit

a) Residents placed in the Community Oriented Unit need assistance in developing basic skills that will enable them to live independently in the community. The basic criteria for placement in this service are:

1. Resident has basic socialization and personal care skills but needs assistance in areas such as homemaking, shopping, financial management, self-medication and use of medical and other community services;

2. Resident lacks appropriate work skills or is unable to sustain a meaningful work effort; or

3. Resident lacks ability to find and maintain appropriate community living facility.

b) The major responsibilities of this unit include:

1. Development and maintenance of community life support skills;

2. Vocational, educational and economic skills required to maintain oneself in the community.

3. Interpersonal skills;

4. Management of internal affairs; and

5. Physical health.

c) Specific programs shall include such activities as social skills, self-medication, consumerism, decision-making and interpersonal relationships.

d) Patients in the Community Oriented Unit shall be provided with experience on and off Hospital grounds which promote independence in social, residential, work-related and other life experiences. The social work staff shall establish mechanisms to contact and involve relevant community agencies in the planning and implementation of the unit.

### 6. Medical Services

a) The Medical Services Unit shall function as a modified acute care facility to serve the physical health needs of all Essex County Hospital Center patients. The Hospital shall provide a written plan of organization detailing the provision of physical medical service to meet the needs of patients. Medical services shall be provided by a licensed physician eligible for certification in the relevant medical field, augmented by an adequate, qualified staff.

b) The Medical Services Unit shall provide the following inpatient service:

1. short term care for patients requiring diagnostic and therapeutic services;

2. nursing and medical care for patients in need of respiratory, pulmonary, or general isolation as a result of a physical illness;

3. the Hospital and Medical Services Unit shall refer all patients in need of surgery to a general hospital where such surgery can be performed. No surgery shall be performed at Essex County Hospital Center with the exception of emergency, life saving procedures.

c) The medical services provided for patients shall include, but not be limited to:

1. Dermatology;

2. Gynecology;

3. Neurology;

4. Ophthalmology;

5. Orthopedic Clinic (on an on-call basis);

6. Otolarnygology;

7. Podiatry;

8. Surgical;

9. Urology (on an on-call basis);

10. Dental

d) In providing medical care, the Medical Services Unit shall take advantage of whatever community-based facilities are appropriate and available. The Hospital shall arrange for consultation with community medical experts when required. Whenever possible and clinically indicated, outside consultants shall be contacted within forty-

eight (48) hours of development of the condition, except in emergent situations, which require immediate consultation and treatment.

### 7. Outreach Unit

a) This unit shall function to serve the needs of those patients at Essex County Hospital Center who are diagnosed as mentally retarded and assigned to this unit. The purpose of the Unit shall be to provide habilitation and training for these patients to prepare them for community placement or alternative care. The program in the Unit shall be established with the following guidelines proposed by the New Jersey Association of Retarded Citizens, hereinafter NJARC, for the Outreach Program: Staffing patterns shall reflect the needs of a specialized disabled population, i.e., the mentally retarded/mentally disturbed. The nursing staff shall emphasize the medical and health aspects of patient care, such as the administration of medication, first aid, and the monitoring of the physical well-being. The program staff, which would include Outreach personnel as well as Hospital personnel, shall be responsible for the daily programming. The program shall operate at least from 7:00 a. m. to 3:00 p. m. which corresponds to the current Hospital staff work hours. Program positions include: 1 Coordinator; 1 Assistant Coordinator; 5 Outreach Instructors; 1 part time Program Consultant; 1 part time Social Worker and 1 part time Licensed Psychologist.

The ward for mentally retarded should be set up as a single unit emphasizing a home-like atmosphere. This arrangement would allow for the space which is so critical in creating an environment for the teaching of appropriate social and educational goals. The area should be exclusively used by those residents. The residents shall participate in the existing Hospital services and programs based on their abilities, as determined by program staff. This plan shall stress a consistent, structured and efficient supervised approach to treatment.

The Hospital shall attempt to have qualifying patients who do not reside in the unit participate in the program.

### 8. Adolescent Unit

a) The Adolescent Unit shall be used as a twenty-four (24) hour care facility for evaluation and short term inpatient care for adolescents, from ages thirteen to seventeen (13–17). Its purpose shall be to provide psychiatric care within the context of community care and education during a specific phase of treatment of the adolescent.

b) The County and Hospital shall exercise its discretion in admissions procedure to exclude from admission to the Adolescent Unit those patients who do not need intensive psychiatric therapy on an inpatient basis, or who are otherwise inappropriate.

c) Discharge planning shall begin upon admission to the Unit. At initial family contact, discharge shall be discussed. If the Division of Youth and Family Services (DYFS) is involved, the DYFS worker shall always be consulted with respect to formulation of the Individualized Treatment Plan. If possible, the DYFS worker should assist in formulating the individual treatment plan.

d) The professional staff shall have training in family intervention in connection with the admission, treatment, and discharge of the individual patient and every effort shall be made to enlist all patients in the form of treatment.

e) No aspect of the treatment program shall abridge any patient's rights.

f) Medication shall only be ordered by the qualified psychiatrist or covering physician assigned to the Unit. Medication shall be administered in such a way as to have minimum impact on school attendance and performance.

g) The procedure to place patients in "Time Out" shall be formalized in the same manner as the procedure for use of seclusion.

h) School shall parallel the rules and regulations as set forth by the local Board of

Education. Each patient shall be enrolled as soon as the local Board of Education has approved the enrollment.

i) The treatment program shall be problem oriented, with discharge as the ultimate goal. Intermediate goals shall be reviewed and upgraded frequently.

j) Appropriate activity therapies, opportunities for exercise, levels of education and life skills training shall be available to all patients on the adolescent unit.

k) Flexible visiting hours designed to encourage maintenance of family and community ties shall be arranged.

l) Under no circumstances shall any aspect of the adolescent program be administered in a manner which would increase the likelihood of the dissolution of family ties.

m) Arrangements shall be made to permit and encourage social interaction between adolescents in Essex County Hospital Center and adolescents in local high schools and community organizations.

n) Diagnostic procedures shall be refined and upgraded to identify and treat the less commonly known physical and psychiatric disorders.

B. The Hospital shall provide for all patients comprehensive treatment services, including, but not limited to:

1. *General Services*

a) Every patient shall have the opportunity to participate in individual and group psychotherapy.

b) An activities program shall be provided to meet the needs of each patient. This shall include but not be limited to such activities as recreation and music therapy.

c) Physical therapy shall be available for all patients as per paragraph (e) below.

d) Treatment teams which include all or parts of nursing, psychology, occupational therapy, vocational rehabilitation, music therapy, social work and recreation therapy, shall develop written plans within ninety (90) days of this agreement outlining the roles of these services and how they shall be delivered to patients.

e) The appropriateness of the services shall be determined by the therapeutic team, which shall include the patient. Referrals for therapy shall be made on the basis of a systematic organized, professional evaluation of the needs of all patients and shall be coordinated by appropriate, qualified staff. The therapeutic teams shall take affirmative steps to actively encourage patients to participate in the various services and programs.

f) Each member of the therapeutic team shall have the responsibility to recommend appropriate follow-up procedures.

g) There shall be specific programming appropriate for the needs of deaf, blind, and other multiple-handicapped persons, which programming shall ensure that mental health services provided by the Hospital shall be as accessible to such patients as they are to any other patient served by the Hospital.

2. *Activities Therapy*

a) Every patient shall have the opportunity to participate in activities therapies, such as occupational therapy, vocational rehabilitation, and/or art/dance/music therapy.

b) Each patient shall participate in the decision as to which activities therapies best suit his/her needs, and shall be provided activities which permit him/her to function at maximum capability.

c) The Hospital shall make activities available beyond 3 p. m. and into the early evening hours.

3. *Individualized Treatment Plans*

For every patient an individual treatment plan must exist and be updated every two (2) weeks for the first three (3) months of hospitalization, every two (2) months thereafter up to one (1) year, and then every three (3) months. Individual treatment plans for patients under twenty two (22) years of age shall be reviewed monthly. The patient shall have input into the development of his/her treatment plan in accordance with the provisions of *N.J.S.A.* 30:4–

24.1. The patient must sign the treatment plan and a copy placed in his/her medical records and a copy given to him/her upon the patient's request. The patient shall be advised in writing of his/her right to receive a copy of the treatment plan. The individual treatment plan shall include the patients' schedule.

a) Each patient shall have a comprehensive physical and mental examination and review of behavioral status within forty-eight (48) hours after admission to the Hospital.

b) Each patient shall have an individualized treatment plan. This plan shall be developed by an interdisciplinary team including a psychiatrist and the patient, and implemented as soon as possible, but, no later than ten (10) working days after the patient's admission. Each individualized treatment plan shall contain:

1. a statement of the nature of the specific problems and specific needs of the patient;
2. a statement of the level of supervision pursuant to Section XI, g herein;
3. a description of intermediate and long-range service goals, with a projected time table for attainment;
4. a statement and rationale for the plan of treatment for achieving these intermediate and long-range goals;
5. a specification of staff responsibility and a description of proposed staff involvement with the patient in order to attain these services goals;
6. criteria for release to less restrictive treatment conditions, and criteria for discharge.

c) As part of his treatment plan, each patient shall have an individualized post-hospitalization plan. This plan shall be developed by the treatment team including the patient within five (5) working days after the patient's admission to the Hospital.

d) In the interests of continuity of care, one mental health professional shall be responsible for supervising the implementation of the treatment plan.

e) The treatment plan shall be reviewed monthly by the mental health professional responsible for supervising the implementation of the plan and shall be modified if necessary. A patient may request the Monitor to review his/her treatment plan at any time. If the monitor or other outside evaluating agency finds the treatment plan inappropriate, the County shall engage an independent psychiatrist to evaluate the patient and prepare a treatment plan pursuant to the guidelines herein.

f) Complete patient records shall be kept on the unit in which the patient is placed. Patient records shall be made available to those persons who are properly authorized by law to review same. These records shall include:

1. Identification data, including the patient's legal status;
2. A patient history, including but not limited to:
   a. Family data; educational background, and employment record;
   b. Prior medical history, both physical and mental, including prior hospitalization;
3. The chief complaints of the patient and the chief complaints of others regarding the patient;
4. An evaluation which notes the onset of illness, the circumstances leading to admission, attitudes, behavior, estimate of intellectual functioning, physical functioning, vocational functioning, personal functioning, memory functioning, orientation, and an inventory of the patient's qualities in descriptive, not interpretive, fashion;
5. A recorded physical examination;
6. A copy of the latest individual treatment plan and any subsequent modifications thereto;
7. A review of the treatment plan which analyzes the successes and failures of the treatment program and directs whatever modifications are necessary.
8. A copy of the individualized post-hospitalization plan and any modifications thereto.

9. A medication history and status, which includes the signed orders of the prescribing physician. Nurses shall indicate by signature that orders have been carried out;

10. Progress notes of each significant contact by a mental health professional with the patient shall be recorded in the patient's chart.

11. A monthly detailed summary of the patient's progress pursuant to his/her treatment plan prepared by the patients' mental health professional.

12. A formal level of functioning assessment which shall have been completed at least every ninety (90) days.

13. A detailed summary of any extra-ordinary incident in the Hospital involving the patient. This shall be prepared by a staff member noting personal knowledge of the incident or specifying the source of information and initialed within twenty-four (24) hours by a mental health professional and the Medical Director and Chief Executive Officer; those incidents pursuant to Section XI, g) shall be noted in the patient file.

14. A summary by the medical director or his/her appointed agent of the findings pursuant to the twenty (20) day review.

g) None of the services described in this part shall be withheld or otherwise modified or denied for the purpose of punishment.

h) Predischarge Planning and Aftercare:

1. The Hospital shall adopt a functional approach to discharge planning, with emphasis on linkage with community mental health and social service agencies;

2. The social service staff at Essex County Hospital Center shall function in all units of the Hospital, not only in those designated as pre-discharge units.

3. Just as the Hospital has one clearly stated admissions process, the discharge process shall be standardized for all patients.

4. Social service department staff should be redeployed in an interdisciplinary unit approach, so that all clients have access to their services; affiliation agreements shall be negotiated and executed with community mental health agencies. The Hospital shall outline the staff responsibility from preadmission screening through discharge planning and follow-up case management after discharge for services, to patients including how, when and where.

5. The intent of the policies and procedures formally articulated by the Division of Mental Health in its pilot Joint Hospital/Community Discharge Projects should be adopted by the County. The Hospital Administration should translate its already verbally stated commitment to the involvement of community mental health liaisons in treatment and discharge planning into concrete, assertive reinforcement.

a. All Hospital staff should be told that comprehensive discharge planning with the appropriate community health and relevant social service resource agencies is a priority and is considered to be an integral part of the in-hospital treatment process;

b. Formal mechanisms such as the following should be instituted and monitored regularly:

(1) inappropriate admission survey;

(2) admission notification process;

(3) individual service/discharge plan (ISDP);

(4) discharge notification process on all clients.

c. A Discharge Coordinator should be designated with the formal authority to direct the discharge planning process for all clients and to monitor community agency responsiveness;

d. Staff development sessions and training opportunities on available community mental health and related social services in Essex County and the benefits of the community involvement in discharge planning should be organized and offered as soon as possible. The importance of the development of community and natural support service linkages prior to discharge should also be emphasized;

e. Community mental health center liaisons should be accepted as equals in treatment and discharge team planning processes in all programs.

6. Visits of Hospital clients to, and participation in, the day/resident activities of community agencies should be facilitated and accepted as an integral part of comprehensive in-hospital treatment and discharge planning.

7. The discharge planning process should be comprehensive, including, in addition to projected clinical needs, housing arrangements, adequate financial support (such as SSI benefits), appropriate vocational and social opportunities, etc., in an effort to reduce the recidivism rate.

8. The Hospital should participate in the Division of Mental Health's Bureau of Housing and Policy Development's housing evaluation process to insure that all community residential facilities used by the Hospital and by Bureau of Transitional Services for discharged Essex County Hospital Center client placements are adequate and meet minimal life/safety and normalization standards.

9. The Hospital administration should make every good faith effort to insure that Bureau of Transitional Services becomes an integral part of discharge planning when boarding home placement is appropriate.

10. The Hospital should emphasize the establishment of treatment and rehabilitation programs focused upon a client's level of personal and social functioning. Training efforts should be directed at educating staff in the functional approach to client evaluation, needs assessment, and service planning, including theories of normalization, levels of functioning, and client advocacy.

11. The treatment/discharge planning process shall be reorganized into a multi-discipline team approach.

12. A team evaluation shall be completed within seventy-two (72) hours after admission. A determination should be made as to short-term or long-term patient hospitalization status. When a patient's status is determined to be short-term, a discharge notification form should be completed. Community agencies shall be notified as to the patient and requested to assess his/her community support needs.

13. Appropriate personnel shall be used to expedite unified services record keeping for admission and discharge notification to community mental health agencies, to conduct periodic samplings of records for inclusion of a comprehensive discharge plan, to make telephone contact with community resources, and to follow-up on the action steps outlined in the individual treatment plan.

14. Client involvement in his/her own needs assessment, in-hospital service goal development, and discharge planning should be administratively supported and actively encouraged.

15. A formal administrative audit procedure shall be conducted regularly and be integrated into the Hospital's ongoing Utilization Review and Quality Assurance procedures. The on-site involvement of community liaisons in programming and discharge planning, the inclusion of community liaisons in the team process, the completion and record inclusion of necessary notification forms, service/discharge plans, etc., shall be reviewed.

16. Patients who can function within a community-based setting as based on level of functioning shall be identified so that comprehensive discharge planning is expedited and linkages made.

17. The scope of the relationship between Hospital staff and community agency liaisons shall be mutually defined by the needs of the patients.

18. Admission and discharge planning should be designed to improve the quality of care, reduce inappropriate or unnecessary admissions, effect discharges with more assurances of community

service linkages, reduce the Hospital census, and increase a client's chances for successful community reintegration.

19. In the event that the County becomes charged by law with the function of monitoring community agencies and is provided by the State with sufficient funding for that purpose, the County government shall then monitor community agency compliance with unified services mandates requiring services to ex-hospital clients as a condition of funding and shall withhold funds and/or seek and/or organize new sponsor agencies if existing sponsors do not show a willingness to comply with the funding mandates.

## IV. TOKEN ECONOMY AND BEHAVIOR MODIFICATION PROGRAMS

1. Behavior modification shall not be designed to eliminate a particular pattern of behavior unless a physician first certifies that he/she has examined the patient with respect to such behavior and that it is not caused by a physical condition which could be corrected by appropriate medical procedures.

2. No patient shall be subjected to a behavior modification program which attempts to modify behavior in order to serve any institutional convenience.

3. Evaluation of the behavior modification programs shall be done by the Department of Human Services which has agreed with the Public Advocate to do the following:

a) Department of Human Services shall review every behavior modification program (including token economies and the adolescent unit) at least annually.

b) A Division of Mental Health Advocacy staff member shall accompany the evaluation team at each visit.

c) The Division of Mental Health Advocacy shall receive thirty (30) days' advance notice of the date of the Department of Human Services team visit.

d) The Department of Human Services team must include professionals skilled in behavior modification concepts and techniques.

e) The Department of Human Services team is to pay particular attention to the Patients' Bill of Rights in evaluating the behavior modification programs.

f) The team report is to be prepared with all due speed after the inspection and is to be furnished to the Division of Mental Health Advocacy and the Monitor at the time it is furnished to the County.

g) The Hospital must rectify any patients' rights violations noted in the report within twenty (20) days of receipt of the report. Any other deficiencies noted in the report shall be rectified within six (6) months.

h) In the event that any one or more of these conditions a) to h) herein is not met the Human Services team shall be deemed to no longer be an acceptable evaluation mechanism for behavior modification programs, and an alternative evaluation mechanism shall be agreed upon by the parties.

## V. STAFFING

Staffing shall be based on the needs of the individual unit for the patients in the Hospital programs and include the following specific ratios and timetables for meeting these ratios. (The ratios are based on staff position per number of patients.)

### A. STAFF TO PATIENT RATIO PER UNIT

| | | ⋯⋯⋯⋯ UNITS ⋯⋯⋯⋯ | | |
| Position: | Compliance Date: | ADMISSIONS | ACUTE CARE | PERSONAL CARE |
| --- | --- | --- | --- | --- |
| Program Chief * | 12/83 | 1 | 1 | 1 |
| Psychiatrist | 12/83 | 1:34 | 2:39 | 1:125 |
| Physician | 12/82 | 2:34 | 2:39 | 2:125 |
| OT/VR ** | 12/82 | 2:34 | 2:39 | 3:125 |

| Position: | Compliance Date: | ADMISSIONS | ACUTE CARE | PERSONAL CARE |
|---|---|---|---|---|
| | | :..............UNITS..............: | | |
| Activities Therapist | 12/81 | · 1:34 | 1:91<br>*** 1:21 | 2:125 |
| Nursing: | | | | |
| R.N. | 1986 | 11:34 | 20:39 | 12:125 |
| LPN | 1986 | 9:34 | 18:39 | 20:125 |
| Para Professional | 12/81 | 18:34 | 21:39 | 63:125 |
| Psychologist | 12/83 | 1:35 | 1:36<br>*** 1:21 | 1:107 |
| Social Service | 12/83 | 4:34 | 5:68<br>*** 3:21 | 1:68 |

| Position: | Compliance Date: | SOCIALIZATION | COMMUNITY ORIENTED | MEDICAL SERVICES |
|---|---|---|---|---|
| Program Chief * | 12/83 | 1 | 1 | 1 |
| Psychiatrist | 12/83 | 2:143 | 1:79 | 1:98 |
| Physician | 12/82 | 1:65 | 1:79 | 2:98 |
| OT/VR ** | 12/82 | 1:39 | 4:79 | 3:98 |
| Activities Therapist | 12/81 | 1:76 | 1:79 | 2:98 |
| Nursing | | | | |
| R.N. | 1986 | 1:10 | 5:79 | 26:98 |
| LPN | 1986 | 1:8 | 6:79 | 23:98 |
| Para Professional | 12/81 | 1:3 | 16:79 | 60:98 |
| Psychology | 12/83 | 4:225 | 1:79 | 2:89 |
| Social Service | 12/83 | 1:25 | 1:25 | 2:89 |

* one per unit -- No Ratios

** OT/VR – Occupational therapist/vocational rehabilitation counselor

*** Ratios apply to Adolescent Unit only

---

The above statistics apply to full time equivalents. Percentages of time can be used. The Adolescent Unit shall comply with the Acute Care ratios except where otherwise voted.

B. *Staffing Ratios Per Work Shift*

The nursing staff shall be allocated by shift in the following ratios:

| | Shift 1 (7am–3pm) | Shift 2 (3pm–11pm) | Shift 3 (11pm–7am) |
|---|---|---|---|
| R.N. | 50% | 30% | 20% |
| L.P.N. | 50% | 30% | 20% |
| Para-profes. | 50% | 30% | 20% |

In the event that the ratios result in a fractionalization of a staff member, the Hospital shall place the fractionalized personnel on the shift which in the medical director's opinion is most beneficial to the patient. In no event shall any shift or unit remain unstaffed.

The Hospital shall make every good faith effort to comply with these ratios as soon as possible, but no later than the staffing compliance dates.

### C. *Qualified Staff to provide adequate services*

1) All physicians and nurses shall meet all licensing requirements promulgated by the State of New Jersey.

2) Physicians and especially psychiatric positions shall be filled with an emphasis on obtaining board certified professionals. The County shall request the Department of Civil Service to increase staff salary levels to facilitate hiring and staff retention.

3) All staff must demonstrate a sufficient degree of proficiency in the English language so that he/she is able to communicate effectively with patients.

4) The Hospital shall implement adequate personnel procedures for candidates to ensure their suitability for the types of services they are to perform.

   a. Written personnel policies and up-to-date employment records covering all employees shall be maintained; the personnel director shall keep the following records:

   1) a written description of each position within the Hospital, including a specific statement of duties, responsibilities and minimum qualifications. There shall be a table of personnel organization, a record of current salaries for the positions and promotion steps within the positions.

   2) written personnel policies pertaining to fringe benefits, recruitment of applicants, termination of training and orientation for new employees as well as training for employees of long-standing; employer discipline and grievance procedures, and relationships with employee unions.

   3) information and records pertaining to employee welfare service, *e.g.*, health and hospital insurance, credit unions, etc.

   4) necessary records for each individual employee including merit evaluation ratings, and disciplinary proceedings.

   b. Applicants for attendant level positions shall be personally interviewed by a mental health professional prior to patient contact.

5) All significant non-emergent psychiatric treatment interventions are to be considered by an inter-disciplinary team which may be chaired by a member of any discipline. Formalized team meetings shall be held on a regular basis to ensure team consensus on patient care and to integrate all staff levels into patient care. Team meetings shall take top priority for all members of the team except for immediate clinical problems. Meetings shall be held on a sufficient basis to ensure review of individualized service plans.

6) Inservice training for the medical and psychiatric staff shall be formally evaluated by the New Jersey College of Medicine and Dentistry, or other agency approved by the Monitor. Recommendations by the College to improve such inservice training shall be made available to all parties and implementation of such recommendation shall be discussed and agreed upon by the parties.

7) The Hospital shall employ to treat at the Wright Pavilion, or other facility housing geriatrics patients, a Board-eligible internist with specialized training in gerontology.

8) Every non-English speaking patient in treatment shall be provided with a mental health professional who can communicate with him/her in his/her own language or through an interpreter. Every deaf, hearing impaired and/or blind patient in treatment shall be provided with a mental health professional who can communicate with him/her or through an interpreter. By June 1983 the Hospital shall provide staff to communicate with the deaf, hearing impaired and/or blind patient.

9) The Hospital and the County shall not permit Hospital staff to work two consecutive shifts, except in emergent situations which cause extraordinary general employee absenteeism.

### D. *Staff (In-Service Training)*

1) All staff training and educational programs shall be consolidated under P.E.E.R., or a similar unit. The unit shall develop within nine months of this agreement interdisciplinary programs incorporating the principles of Normalization, as well as specialized training programs for particular units, programs or disciplines.

a) The unit shall provide:

a. General orientation for each new Hospital employee as to the Hospital and his/her area of employment. All new attendants and nurses shall receive two weeks (five days a week) for a total of eighty (80) hours of intensive training on a variety of topics from human behavior to Hospital procedures. Training sessions shall be conducted by trained, experienced professionals. Attendance shall be mandatory.

b. Intensive in-service training on a regular basis shall be available for all staff from attendants to physicians who are involved in patient care. This training shall include:

1. regular presentations for the medical and psychiatric staff;

2. courses for attendants and nurses in such areas as crisis intervention, normalization, remotivation and medication.

c. At least yearly, each staff member in (b.) above shall receive training appropriate to his/her program level of assignment.

d. Procedures for formal evaluation of each employee participating in training, including post-training and follow-up and supervision.

2) The Hospital shall make a good faith effort to establish affiliation with the New Jersey College of Medicine and Dentistry in such areas as joint staff appointments, a residency program, and ongoing staff education and development.

3) The existing employee orientation and training program shall be evaluated annually by New Jersey Department of Civil Service.

### VI. QUALITY CONTROL AND PROGRAM EVALUATION

The Hospital shall employ a coordinator to develop and maintain a quality assurance/evaluation program for the Hospital Center. This program shall be designed to monitor and evaluate the Hospital activities pertaining to the quality of care given patients in accordance with licensing and accrediting agency standards.

### VII. NUTRITIONAL STANDARDS AND DIETS

a) Patients shall eat or be fed in dining rooms at all times except when it is not medically appropriate.

b) The diet for patients shall provide at a minimum the Recommended Daily Dietary Allowances as developed by the National Academy of Sciences. Menus shall be satisfying and nutritionally adequate to provide the Recommended Daily Dietary Allowances. The nutritional aspects of patient care shall be under the direction of the clinical dietician, who shall assure that the diet shall be adequate, sufficient and meet nutritional standards.

c) Provisions shall be made for special therapeutic diets and for substitutes at the request of the patient, or his guardian or next of kin, in accordance with the religious requirements of any patient's faith.

d) Denial of a nutritionally adequate diet shall not be used as punishment nor be withheld in any way as part of a behavior modification program or any other treatment plan.

e) The dietetic service shall conduct regular periodic food acceptance studies among patients and shall encourage patients to participate in menu planning and food selection.

f) The dietetic service shall be directed by a qualified full time dietician and staffed by a sufficient number of dieticians and technical personnel. The nutritional aspects of patient care shall be under the direction of a qualified dietician whose duties include: recording dietary histories of patients, interviewing patients regarding their food habits, counseling patients and their families, participating as appropriate, in clinical rounds and conference, and advising patients of their special dietary needs and possible interaction between food and medication.

g) The Hospital shall post the Food Service Table of Organization in all cafeterias.

h) Following the evening meal nutritional supplements shall be available for each patient at the Hospital.

## VIII. PHARMACEUTICAL SERVICES

The Hospital shall use a unit dose pharmaceutical distribution system. The Hospital shall also employ two (2) clinical pharmacists based on the present patient population.

## IX. MEDICAL RECORDS

a) The Medical Records service shall be adequately directed, staffed and equipped to facilitate the accurate processing, checking, indexing and filing of all medical records.

b) The Hospital shall maintain a unified charting system.

c) A qualified medical records administrator shall be employed on a full time basis, to advise, administer, supervise, and/or perform work involved in the development, analysis, maintenance and use of records.

d) Medical records personnel shall be involved in staff development programs, including orientation, on-the-job training, and regular in-service education programs.

e) A Utilization Review Committee, composed of a qualified medical records administrator, representatives from the medical staff and other service members who contribute to medical records, shall review the medical records.

f) There shall be surveillance of the quality of patient care provided through review and evaluation of the medical records. Delinquent records shall be identified and procedures established to ensure that such records are promptly brought up to date.

g) A utilization review coordinator shall maintain a continuous program of review of the care and services rendered to patients by reviewing all patients' charts in the Hospital.

h) A timetable shall be developed, within 60 days of the entry of the Court Order incorporating this Agreement, to review the records of each patient in the Hospital.

## X. PATIENTS DISCHARGED PENDING PLACEMENT

a) The County shall direct the Hospital, and in particular the Social Service Department to make extensive efforts to involve community agencies in discharge planning and aftercare from the time of admission of the patient to ECHC.

b) The Hospital shall maintain a pre-discharge program or plan for each patient, to the extent that he/she may be appropriately placed in the least restrictive community facility.

## XI. MISCELLANEOUS PROVISIONS

a) Notice of Patients' Rights as enumerated in N.J.S.A. 30:4–24 through 30:4–24.2 shall be posted in a conspicuous place on each patient resident unit; patients' rights shall be provided to each patient in his/her

own language or read to those patients who cannot read.

b) All the provisions of *N.J.S.A.* 30:4–24 through 30:4–24.2 shall immediately be implemented by the Hospital through this Agreement.

c) *Psychotropic Medication for Involuntarily Committed Patients*

In keeping with the present law regarding the administration of psychotropic medication to involuntarily committed patients, the County shall employ a full time person who shall serve as a Medication Counselor. The person may be an attorney, psychologist, social worker, registered nurse, paralegal or someone possessing like skills and experience. Any involuntarily committed patient who refuses the administration of psychotropic medication shall be referred to the Medication Counselor who shall assess the patient's feelings about the drug, or any alleged use of force, or alleged threat of force by the Hospital staff to administer the drug. The Medication Counselor may then, in his/her discretion, initiate review to the Medical Director and/or to an Independent Psychiatrist.

The County shall establish a procedure to provide for an Independent Psychiatrist to decide if forced medication is appropriate. Four factors are to be considered: (1) the patient's physical threat to other patients and staff at the institution, (2) the patient's capacity to decide on his particular treatment, (3) the existence of any less restrictive treatments, and (4) the risk of permanent side effects from the proposed treatment. Should a decision of forced medication be made by a treating physician, the Medication Counselor shall serve as informal counsel to the patient in the due process safeguards which inure to the patient in the internal review of that decision by the Medical Director of the Hospital and the hearing held by the Independent Psychiatrist. The hearing may be initiated by the Hospital or by the Medication Counselor if the Hospital seeks permission to involuntarily medicate a patient who refuses to provide consent.

The Medication Counselor may also consult with any patient and assist patients who wish to refuse treatment. He/she shall also require written consent for a patient who had previously given written consent and subsequently refused psychotropic medication. The Medication Counselor may initiate review of decisions to medicate legally incompetent patients and decisions to medicate "functionally incompetent" patients, *i.e.* patients whom a treating physician has certified are unable to provide knowledgeable consent to treatment, although they have not been declared incompetent by a court of law.

All patients shall receive notice that they are receiving psychotropic medication along with a description of its side effects and notice that the patient has a right to refuse such medication.

The parties further agree that the continuation of this procedure is contingent upon the final determination of the law regarding the administration of psychotropic medication to involuntarily committed patients.

d) *Patients' Funds*

The Hospital shall provide the patients with a repository for their personal funds.

1. Patients shall be permitted to deposit their funds at the Essex County Hospital Center business office in interest bearing accounts, or to retain possession of such funds on their person. The Hospital shall advise the patients that interest on the deposits shall be used pursuant to *N.J.S.A.* 30:4–67.1. The Hospital shall provide individual locked storage space in the patient's control on each ward, pursuant to the terms of this agreement.

2. The County acknowledges that the patients should have ready access to their funds which are deposited in the business office. The County shall not be responsible for any loss by the patients of these funds. The County may require twenty-four (24) hours advance notice for patients to withdraw monies in excess of One Hundred Dollars ($100).

3. Patients shall be permitted unrestricted access, during regular business hours, to their funds. Those patients who wish to withdraw or deposit funds at the business office must do so in person; the Hospital shall provide non-ambulatory patients with the necessary transportation to reach the business office. Non-ambulatory patients may withdraw funds by written authorization to social workers and/or nurses for withdrawal of specific dollar amounts. In no event shall prior authorization be given for withdrawal of unspecified sums from a patient's account by any person, service or organization within the Hospital.

e) Confidential patient information shall be kept in charts and records and shall not be open or available to the public.

f) All use of seclusion rooms shall be documented and such documentation shall be available for inspection by the Public Advocate or the patient's attorney.

### g) *Allegations of Physical Abuse*

Whenever an incident occurs which involves an allegation of physical abuse of a patient, the patient or his/her representative may, or any Hospital employee to whom a complaint is made shall, report the incident only to the Director of the Department or his/her designee. That office shall gather all available relevant data pertaining to the allegations in writing.

The Department Director or his/her designee shall make a determination, within five hours of the reporting of the incident as to whether the employee shall be temporarily transferred from contact with the complaining patient. The determination may include his/her evaluation of the data presented in the report of the incident including a conversation with the patient accompanied by a physician. If possible, the accompanying physician shall be the treating physician. Upon reporting of the incident to the Department Director, he/she shall notify the Public Advocate in writing that the named patient has filed a complaint.

Upon the reporting of the incident, the employee shall be temporarily transferred from contact with the complaining patient unless the report or allegation of abuse appears to have been impossible, or it appears from the written record of reports and investigations that a patient has so repeatedly and chronically complained of abuse by the same employee that a reasonable person could not conclude that the patient is in immediate jeopardy of abuse or intimidation. The transfer shall be effective immediately and shall continue until either the director upon reevaluation finds the allegation falls within one of the above exceptions or until disposition, at which time the department director, or his/her designee, shall make a final administrative decision concerning transfer.

Within seven working days of the reporting of an incident of physical abuse of a patient, the Department Director or his/her designee, shall send to the Law Department, in writing, all available relevant information concerning the incident and background information, including but not limited to the following:

a) pages from the day book concerning the day in question,

b) statements of the affected patient, witnesses to the incident, and the accused employee if he/she so desires,

c) personnel data of the employee in question, medical background of the patient, and information concerning prior abuse complaints made by the patient,

d) copies of relevant departmental policies and records,

e) recommended sanction, if any, and reasons in support thereof.

The Public Advocate shall, within seven days of their receipt of the notice that an incident was reported, forward to the Law Department in writing either any available data which it desires to submit concerning the incident or a statement that it has nothing to submit. At the same time, the Public Advocate may make a written request for a conference with the Law Department attorney handling the matter

which request shall be honored by the Law Department. It is expressly understood that only licensed attorneys shall conduct the conference and receive the statistical results of the disciplinary action. The Public Advocate may bring, at its discretion, staff members or other agents to the conference.

Nothing herein shall preclude any person from submitting information concerning the complaint at any time that such information becomes available.

The Law Department shall itself conduct any investigation it deems necessary. It shall thereafter (1) issue a Preliminary Notice of Disciplinary Action or (2) refer the matter for progressive discipline as is provided in S.O.P.P. 79–11 or (3) dismiss the matter. At all times, the procedure contained in the Essex County Uniform Disciplinary Procedure shall be followed except as provided for herein.

On a quarterly basis, the Law Department shall provide the Public Advocate with reports concerning the status of allegations of physical abuse of patients. The reports shall contain the following data for the preceding quarter: (1) the number of incidents reported, (2) the number of formal disciplinary actions commenced by Preliminary Notice of Disciplinary Action, (3) the number of matters referred for progressive discipline, (4) the number of matters dismissed without a recommendation for either progressive or formal discipline, (5) the number of matters disposed of by Final Notice of Disciplinary Action, and (6) a break-down of the various sanctions imposed by way of Final Notice of Disciplinary Action. These figures shall be categorized by the number of physical abuse complaints filed against the employee and the specific disposition of the present complaint.

The Public Advocate agrees to be bound by the principles of confidentiality contained in the Right to Know Law and not disclose said information. In no case shall the identity of the employees involved be revealed.

h) *Levels of Supervision*

There shall be a presumption that all patients shall be restricted only to the extent which shall be clinically necessary or necessary to the Hospital's internal order and security, but not for administrative convenience. Decisions made relative to ward placement shall be based on the clinical condition of the patient and individual symptomotology. Decisions made as to individual access to and from the wards shall be made by the treatment team based on the different levels of therapeutic treatment. The fact of legal commitment does not of itself establish dangerousness for purposes of determining the level of supervision herein.

LEVEL A

Level A supervision shall allow the patient maximum institutional flexibility subject only to curfews and the patient's individual responsibility for meeting treatment or obligations. The standards used to determine level A shall be based on the following:

1. The patient does not meet Level B and Level C standards.

LEVEL B

Level B supervision is a medium level of supervision. The standards used to determine level B supervision shall be based on the following:

1. There is a reasonable basis to believe that the patient could be a danger to him/herself, or to others, or might cause significant damage to the property of others.

or

2. There is a reasonable basis to believe that the patient is an elopement risk.

Patients falling in this category shall be allowed on the Hospital grounds for a reasonable period of time every day without supervision if clinically appropriate. Patients may also be allowed additional on-ground activity, off-ground activity, weekend passes, and such other unsupervised

activities as the treatment team deems appropriate. The on-ground time shall be scheduled so as not to interfere with therapy, meal times or other patient activities.

## LEVEL C

Level C supervision shall be complete and constant. Standards used to determine level C shall be based on the following:

1. The patient is a clear danger to him/herself, or to others, or is likely to cause significant damage to the property of others and is an elopement risk or the patient is a clear danger to him/herself, or to others, or is likely to cause significant damage to the property of others.

or

2. The patient has an intention to presently violate the law as evidenced by demonstrated behavior or by the statement of such intent.

The Admissions Ward shall be a completely and constantly supervised ward.

For any patient who is committed to the Hospital under a court order, warrant or detainer which imposes restrictions which conflict with the provisions of this Section, the legal restrictions set forth in such court order, warrant or detainer shall take precedence over these provisions for purposes of determining the level of restrictions to be imposed on the patient.

When such a court order, warrant or detainer does not specify the nature of the restrictions, the decision made under this Section regarding Level A, B, or C supervision shall be made at the discretion of the treatment team taking into account the fact of the court order, warrant or detainer and the nature of the conduct charged. With regard to the latter category of court order, warrant or detainer, the Hospital may notify the sending court or the sending authority, in writing, if the clinical decision is to place the patient at Level A or B supervision. If the Hospital chooses to provide such notification, it must do so within two (2) days of the clinical determination.

The placement shall take place within seven (7) calendar days of notification to the court or sending authority, unless the court or sending authority orders otherwise.

Review of the level of supervision for Level B and Level C patients shall be as necessary and at least every twenty (20) calendar days. Review of Level A patients shall be as necessary.

i) The Hospital agrees to make the following available:

1. Medical screening and treatment for special conditions and/or handicaps such as spina bifida;

2. Pregnancy screening for all female patients;

3. Procedures to regulate multiple transfers of patients among wards; and

4. Provisions for restorative physical therapy.

j) The Hospital shall comply with the provisions of the State and Federal Bill of Rights for the Developmentally Disabled, N.J.S.A. 30:6D-1 et seq., and 42 U.S.C.A. S6000 et seq., for the patients who fall within the purview of those acts and only to the extent applicable by law.

k) Patients and their attorneys shall be given timely notice when the Hospital applies to be the representative payee to receive payment of benefits to which the patient is entitled.

l) The Hospital shall provide facilities for non-ambulatory patients to assure their safety and comfort, including special fittings on toilets and wheelchairs. Appropriate provision shall be made to permit non-ambulatory patients to communicate their needs to staff.

m) The County agrees to comply with JCAH educational standards by 1986 as those standards are delineated for the patients at Essex County Hospital Center as follows:

20% of the total patient population by 12/82

40% of the total patient population by 12/83

60% of the total patient population by 12/84

80% of the total patient population by 12/85

100% of the total patient population by 12/86

n) If the patients at the ECHC form a Patient Government Organization, the County shall, through the Patients' Welfare Fund Committee, pursuant to Resolution No. 32098, Patients' Welfare Fund, entertain requests for expenditures from that Fund to assist the Patient Government Organization. The Hospital shall assist that Organization wherever possible.

o) It is expressly understood that neither counsel for the plaintiffs, nor counsel for the defendants shall seek or receive legal fees in this matter.

p) The parties agree that the Court retains such jurisdiction as may, from time to time, be required for enforcement of this Agreement, which includes, but is not limited to: (1) receiving reports from the Monitor and (2) receiving prior notice of any inability or impracticality in meeting the objectives of this Agreement including a statement of the causes and nature thereof.

q) Nothing contained herein shall limit or restrict any and all of the statutory powers conferred upon the Division of Mental Health Advocacy, Department of the Public Advocate.

r) The complaint be and hereby is amended to add the County of Essex as a defendant.

s) Plaintiffs' complaint is dismissed with prejudice without costs.

t) This agreement contains the entire understanding of the parties and there are no representations, warranties, covenants, or undertakings other than those expressly set forth herein.

u) All vocational rehabilitation issues shall be governed by *Schindenwolf v. Klein*, L 41293–75, Superior Court, New Jersey.

v) The Hospital shall continue to have autopsies performed in all cases of sudden and unexplained patient deaths and shall receive those results.

## XII. MONITORING AGREEMENT

Implementation of, and compliance with the standards and services set forth herein shall be monitored according to the following terms.

1. The Court shall appoint a Master who shall be an attorney to act on a part time basis to monitor the provisions of this Agreement. Prior to the appointment, the Court will advise the parties of the identity of the proposed Master and provide the parties with the opportunity to be heard if they have objections to said individual. The Master shall serve until 1986 or until the modifications required by this Agreement shall have been implemented whichever occurs first.

2. The Master shall have sufficient office space and have access to a secretary to enable him/her to adequately perform all aspects of the monitoring functions as set forth below. The County shall provide on the Hospital grounds a specific location for ready access to the Master.

3. The Master shall be compensated at a reasonable hourly rate to be set by the Court prior to his/her appointment. The Master shall be paid by the County for his/her hourly services on a quarterly basis and after his/her submission of an affidavit of services reciting the hours expended and the nature of services provided. It is expressly understood that the maximum annual renumeration for the Master shall not exceed $36,000. In the event that the Master is unable to adequately perform his/her duties within said maximum then the Master, upon becoming aware that the maximum may be exceeded, shall immediately advise the Court and all parties. The Court shall after hearing the matter determine what adjustments, if any, are necessary. All expenses incurred through monitoring activities shall be borne by the County of Essex. Fees for consultants as are reasonably necessary shall be approved, processed and paid for by the County of Essex pursuant to its regular business.

4. Notwithstanding the powers enumerated for masters pursuant to Federal Rule

of Civil Procedure 53 or related case law, the Master herein shall possess exclusively the powers set out in this Agreement.

5. The Master shall have complete and ongoing access to all Hospital wards, patients and records in connection with his/her monitoring activities.

6. The Master shall be permitted to interview any person affected by or involved in the implementation of this Agreement. Any employee may be interviewed by the Master but if that interview would be lengthy enough to distract the employee from his/her duties, the Master must arrange the interview in advance with the supervisor of that employee.

7. The Master shall keep any and all information privileged and confidential as to all parties except for the plaintiffs and defendants herein.

8. It shall be the responsibility of both parties to make available to the Master within 72 hours of request, or longer at the discretion of the Master, any reasonably necessary records, reports, documents, information and data pertaining to the terms of this Agreement.

9. The Master may meet periodically with the parties. The Master shall provide the parties with an agenda for these meetings at least seven (7) days prior to the meeting. (The Master and the parties may consent to less notice.)

10. Commencing upon appointment, the Master shall submit written reports to the Court every three (3) months for the first year, every six (6) months thereafter for the term of the Master's tenure. In addition, the Master shall submit written reports to counsel for the parties every three (3) months which reports shall document: (a) current levels of compliance; (b) reasons for non-compliance, and recommendations for achieving compliance, where such is found to be the case, including identifying the officials or departments deemed by the Master to be responsible for such non-compliance; (c) the Master's assessment of County and Hospital efforts to comply with this Agreement; (d) any problems or obstacles which the Master has encountered in executing his/her responsibilities; (e) any other information the Master deems pertinent. One week after the receipt of the Master's report, the Master and parties shall meet and discuss the report.

11. In addition to the above enumerated activities, the Master shall have the following authority and responsibilities:

a) Meeting with the Hospital and/or County officials to discuss matters involving compliance with this Agreement, as set forth above;

b) Meeting with counsel for defendants and plaintiffs to discuss matters involving compliance with this agreement;

c) Periodically reviewing, and revising, if necessary, and with the consent of the parties, timetables for compliance with the various Sections of this Agreement;

d) Serving as the mediator of any disputes which may arise among or between the parties with regard to levels of compliance with any aspect of this Agreement.

12. The Master may call meetings of groups of Hospital employees, subject to paragraph 5 above, to discuss compliance with this Agreement. Those meetings shall be comprised of employees who may choose to attend and the Director of the Department of Health and Rehabilitation or his/her designee may also attend. In advance of calling such meetings, the Master shall notify the Director of Health and Rehabilitation of the names of the employees who shall attend the meeting and the general topic of discussion. Prior to the meeting the Monitor shall also give the Director of Health and Rehabilitation an opportunity to discuss with the Monitor the scheduled topics. The Monitor shall not provide said employees/employee with any information or documents other than that which the agreement permits the monitor to make public. The monitor shall not cite publicly or to the Court any opinions or recommen-

dations of said employee or groups of employees.

12. The monitor shall not seek to influence the hiring, promotion or increase in compensation of any individual.

13. A modification or waiver of any of the provisions of this agreement shall be effective only if made in writing and executed with the same formality as this agreement.

14. Modification of any of the terms concerning the function and authority of the Monitor shall be made only with the consent of all parties and the approval of the Court.

15. The Monitor may be replaced only on application to the Court by one of the parties upon showing of good cause, and with the approval of the Court.

16. Nothing contained herein shall permit the Monitor to obstruct or interfere with the operation and function of the Hospital.

17. Any notices to the parties by the Monitor shall be satisfied by mailing same to:

State of New Jersey,
Department of the Public Advocate
Division of Mental Health Advocacy,
Essex Region
744 Broad Street
Newark, NJ 07102

Director, Department of Health
& Rehabilitation, Essex County
Hospital Center
Cedar Grove, New Jersey 07009
with a copy to:
Essex County Law Department
Hall of Records
High Street
Newark, NJ 07102

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

State of New Jersey Department
of the Public Advocate

COUNTY OF ESSEX
State of New Jersey

By:_____

Stanley Van Ness
Public Advocate

By:_____

Peter Shapiro,
Essex County Executive

_____
_____
_____

## ORDER APPROVING STIPULATION OF SETTLEMENT

Counsel for Plaintiffs and Defendants having agreed upon a basis for the settlement of this action, and having entered into a Stipulation of Settlement, the original of which having been filed with this Court and a copy attached hereto; and said Stipulation of Settlement having been made solely for the purpose of settlement and without admission as to any of the allegations of the Complaint;

And it appearing that there has been no trial of the matter alleged in the Complaint; and the Defendants not having conceded that their past conduct has failed to comply with legal requirements;

IT IS, THEREFORE, upon the Stipulation of Settlement, and pursuant to R. 23(e) of the Federal Rules of Civil Procedure

ORDERED that:

1. The Stipulation of Settlement shall be attached to this Order, and its terms and conditions are incorporated herein and made a part hereof; and

2. Plaintiffs' Complaint is dismissed with prejudice without costs as against all the Defendants.

852

s/ _____
HONORABLE HERBERT J. STERN, U.S.D.C.J.

DATED: 7/20/81

We hereby Consent to
the Form and Entry of
the Within Order.

STANLEY C. VAN NESS
Public Advocate
Attorney for Plaintiffs

s/ _____
By: PAULA S. CHAFFIN, ESQ.
Assistant Deputy Public Advocate

s/ _____
DAVID H. BEN-ASHER, ESQ.
Essex County Counsel
Attorney for Defendants